**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Respondent,** | ) | **Case No. 13 C 148 (03 CR 689-2)** |
| | ) | |
| **v.** | ) | **Judge Joan B. Gottschall** |
| | ) | |
| **MAGIN VILLASENOR,** | ) | |
| **Movant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Following a jury trial, defendant Magin Villasenor was sentenced to 300 months of imprisonment. He filed a pro se motion to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255. The court rejected arguments presented in Villasenor's pro se motion and appointed counsel to represent Villasenor at an evidentiary hearing to address ineffective assistance of counsel claims relating to plea negotiations. For the following reasons, Villasenor is not entitled to § 2255 relief.

## I. BACKGROUND[1]

### A.    Procedural Posture

Villasenor was part of a multi-defendant drug conspiracy case that included his wife and brothers. He was charged with one count of conspiracy to traffic illegal drugs in violation of 21 U.S.C. § 846, one count of illegally possessing a firearm in violation of 18 U.S.C. § 922(g)(1), and multiple counts of distributing a controlled substance in violation of 21 U.S.C. § 841(a)(1)

---

[1] The following background is a brief overview of the evidence presented during the evidentiary hearing. The court will discuss details when it considers Villasenor's ineffective assistance of counsel claims. The court also notes that it has disregarded legal conclusions in the government's statement of facts, such as its contention that certain discussions were "simply negotiations," as opposed to a formal plea offer. (Dkt. 63 at 2-3.)

and of using a communication facility (the telephone) in committing a felony narcotics offense in violation of 21 U.S.C. § 843(b).

Villasenor, through his retained attorney Joseph Lopez, entered a blind plea of guilty without a plea agreement. Villasenor subsequently moved to vacate his guilty plea. Over the government's objection, the court granted Villasenor's motion to vacate his guilty plea and Villasenor proceeded to trial. A jury acquitted Villasenor of three charges but convicted him of conspiracy to distribute or possess with intent to distribute more than 5 kilograms of cocaine, illegal possession of a firearm, and multiple distribution and telephone counts. Villasenor was sentenced to 300 months of imprisonment.

Villasenor (still represented by Lopez) filed a direct appeal with the Seventh Circuit arguing that: (1) insufficient evidence supported the jury's finding that he was involved in a conspiracy instead of multiple buyer-seller relationships; (2) insufficient evidence established that he constructively possessed a gun found in his Chicago apartment because he was in Texas when law enforcement found the gun; (3) because his brother had been a government informant, the district court abused its discretion by admitting his brother's statements as co-conspirator admissions; and (4) the district court erred in denying his motion for a new trial because the government suppressed favorable evidence that could have been used to impeach the testimony of a DEA chemist who testified about drug residue found on a scale recovered from the bedroom of a co-conspirator. *Villasenor*, 664 F.3d at 679.

The Seventh Circuit affirmed Villasenor's conviction. *Id*. Villasenor filed an unsuccessful petition for a writ of certiorari with the United States Supreme Court. He then filed a pro se § 2255 motion. The court rejected some of Villasenor's arguments and appointed

counsel to represent him at an evidentiary hearing to address ineffective assistance of counsel claims relating to plea negotiations. (Dkt. 17.) At the evidentiary hearing, Villasenor, Nicol Villasenor (Villasenor's wife), former Assistant United States Attorney Joseph Alesia, and Joseph Lopez (Villasenor's trial counsel) testified.

## B. Pretrial Proceedings

### 1. The Proffer Session

In August 2003, Villasenor, accompanied by Lopez, went to the United States Attorney's Office to participate in a proffer session. (Tr. 140-141, 213-14.) Before the proffer, Villasenor reviewed and signed a letter acknowledging that he was required to tell the truth (Def. Ex. 8) but he concedes that he nevertheless was untruthful (Tr. 106-07, 140-141). Thus, the government terminated the proffer.

### 2. Testimony About An Alleged Proposed Plea Agreement Requiring Villasenor to Plead Guilty to Two to Four Kilograms of Cocaine

Villasenor and his wife testified that in February 2004, Lopez failed to convey an offer for Villasenor to plead guilty to two to four kilograms of cocaine. According to Nicol Villasenor, Lopez told her about the offer in a phone call but then failed to convey it to Villasenor before the government withdrew the offer.

In contrast, Lopez denied that any such offer was made. (Tr. 230.) Alesia testified that he was certain that he did not make any such offer because it would have been "so far out of the realm of possibility based on the evidence we had." (Tr. 171.)

### 3.    The Government's Post-Proffer Meeting

On March 18, 2004, Alesia met with his supervisors to discuss Villasenor's case.  (Tr. 142-145.)  Alesia believed that about 600 kilograms of cocaine could be attributed to Villasenor under the Sentencing Guidelines.  (Tr. 143-144; Gov. Ex. 10.)  He calculated that based on Guideline enhancements (a leader-organizer role in the offense and possession of a gun) and a criminal history category of IV, Villasenor's Guideline range would be 292-365 months.  (Gov. Ex. 10.)  During the meeting, however, the government attorneys agreed that (1) if Villasenor proffered and (2) explained how his prior drug conviction was part of the charged conspiracy, and (3) if the government could corroborate that explanation, then Villasenor would be in criminal history category I.  (Tr. 145-146.)  This would cause his Guideline range to be 210-262 months.  (*Id*.)

At the meeting, the government attorneys also discussed the potential for Villasenor to proffer again.  Despite the issues with Villasenor's August 2003 proffer, the government remained interested in his cooperation if he proffered truthfully and agreed to cooperate against his co-defendants, as well as in two public corruption investigations.  (Tr. 146.)   If Villasenor did so, the government attorneys agreed that the ceiling for any cooperation credit would be 25%, which could lower his sentence to 157 months, and that they would not file a notice of § 851 enhancement. (Tr. 146-147.)

The government asserts that as of the March 18, 2004 meeting, Villasenor was not eligible for a cooperation deal and there was no formal internal agreement on what, if any, credit he would get if he chose to cooperate (although the government attorneys agreed to a 25% ceiling) because the government had not yet heard what Villasenor had to say.  (Tr. 146-147.)

According to Alesia, as of the time of the meeting, he was not authorized to make a formal plea offer and had not yet submitted a plea proposal package to his supervisors. (Tr. 147-149.)

Villasenor testified that between late March and April 2004, Lopez visited him twice to convey plea offers of thirteen and eighteen years, respectively, based on Villasenor's cooperation. (Tr. 55.) According to Villasenor, he rejected these offers based on Lopez's representation that the government's case was "weak." (Tr. 56-57.) To support his contention that these offers were made, Villasenor notes that the government's internal calculations during the meeting are consistent with plea offers of thirteen and eighteen years, as 157 months is slightly over 13 years and 210 months (the low end of the 210 to 262 month range) is 17.5 years.

### 4. The Government's Continued Interest in Villasenor's Cooperation

After the March 18, 2004 meeting, the government asked Lopez if Villasenor was interested in cooperating. (Tr. 148, 205-206.) Lopez followed up by meeting with Villasenor. (Tr. 206). Lopez told Villasenor about the government's Guideline calculations and discussed the possibility that the government would file a notice of § 851 enhancement. (Tr. 206-07). The § 851 enhancement was an important issue for Villasenor because it would increase his mandatory minimum sentence from 10 to 20 years if the government established the requisite drug quantity. (Tr. 207.)

When Lopez brought up the possibility of cooperating, Lopez testified that Villasenor said that "he wasn't interested." (Tr. 208.) According to Lopez, "[Villasenor] didn't like the cooperators in his case, and he wasn't the type of person that I [thought] would ever cooperate." (*Id*.) Lopez characterized Villasenor as "one of the old Mohicans. I mean, he just didn't want to cooperate, he didn't like the fact that [his brother] Carlos had cooperated and it was just – it

wasn't in his – I don't think he – he just didn't want to do it." (Tr. 208-210.) Lopez had represented Villasenor in a prior criminal case where Villasenor expressed the same negative view about cooperation. (Tr. 209.)

Lopez testified that on "numerous occasions," he and Villasenor discussed potential Guideline calculations, the government's view of the Guidelines, the possibility of § 851 enhancement if the government could establish that Villasenor was responsible for more than five kilograms of cocaine, and the option of cooperation. (Tr. 211.) Lopez thought that Villasenor was "pretty smart"; Villasenor was able to conduct his own research and Lopez believed that Villasenor was able to "understand what the cases said." (Tr. 213.) Villasenor consistently told Lopez that he did not want to cooperate. Lopez thought that Villasenor "appeared to understand what his options were in this case." (Tr. 211.)

Lopez denies that he ever told Villasenor that the government would not be able to prove that Villasenor was responsible for at least five kilograms of cocaine. (Tr. 264.) Instead, Lopez testified that he advised Villasenor that the government could potentially prove more than this quantity. (Tr. 264.)

### 5. The June 2010 Proposed Plea Agreements

On April 15, 2004, Lopez wrote a letter to the government stating that he had:

> discussed all of the options with Magin Villasenor in regard to a Plea of guilty with and without cooperation. I have also discussed the base offense level and any additional points for role in the offense and drug quantity levels. I have discussed these matters with him on numerous occasions. As of April 12, 2014, my client has expressed his desire to exercise his right to a jury trial. As a result, our negotiations I guess are now concluded. I appreciate the opportunity to pitch my client in regard to the several dispositions which we previously discussed.

(Gov. Ex. 11; Tr. 211-212.)

At some point between mid-April 2004, when Lopez advised the government that Villasenor wanted to go to trial, and early June 2004, Lopez asked Alesia for a plea agreement without a cooperation provision and with an "agree-to-disagree" paragraph about the drug quantity.  (Tr. 150-52, 217-18.)  This resulted in a draft proposed plea agreement and a formal approved version of that proposed agreement that differ in certain material respects.

### a.  June 10, 2004 Version

In response to Lopez's request, Alesia prepared a proposed plea agreement that included the government's basis for a drug quantity of approximately 250 kilograms of cocaine.  (Gov. Ex. 1.)  The proposal also included the requested agree-to-disagree paragraph regarding drug quantity, stated that Villasenor's anticipated criminal history category was IV, and did not indicate that Villasenor would cooperate.  (Tr. 150-52; Gov. Ex. 1.)  The accompanying cover letter to Lopez, dated June 10, 2004, described the attached proposed plea agreement as "a draft that has yet to be approved by my Office."  (Gov. Ex. 2.)

### b.  June 18, 2004 Version

At the same time, Alesia submitted the draft proposed plea agreement to his supervisors for their review.  Based on instructions from his supervisors, Alesia prepared a revised version. (Gov. Ex. 3.)  The revised version removed the agree-to-disagree paragraph about drug quantity and specified that the anticipated sentencing range was 292-365 months.  (Tr. 153-55; Gov. Ex. 3.)  Alesia sent the revised version to Lopez on June 18, 2004.  (Tr. 155-56; Gov. Ex. 4.)

The accompanying cover letter to Lopez (Gov. Ex. 4) stated that the updated proposed plea agreement was a formal plea offer that had been approved by the U.S. Attorney's Office. (Tr. 155-56; Gov. Ex. 4.)  The first paragraph of the letter explained the differences between the

approved version and the prior version, expressed the reasons why the government believed that a drug quantity of over 150 kilograms was "easily proven," and stated that the government would file two § 851 enhancements if Villasenor went to trial, which would result in a mandatory life sentence. (Gov. Ex. 4.)

The second paragraph of the letter – which Villasenor contends is, itself, a formal plea offer – stated that:

> Finally, until the close of business on Friday, July 2, 2004, your client can still give a complete and truthful proffer statement and cooperate against the remaining defendants. If he does so and we can confirm that his prior drug convictions were part of the charged conspiracy, his criminal history would be I, resulting in a sentencing range of 210-262 months, as opposed to 292-365. Additionally, we would consider a small percentage off the low end of the applicable Guideline range in exchange for his cooperation. Finally, contingent on his wife's truthful and complete safety valve proffer, we would recommend that she receive pretrial diversion and avoid a potential sentence upon conviction of a mandatory 10 year prison term. Again, this offer will be valid through close of business on July 2, 2004, at which time the government will begin preparations for trial to begin on July 26, 2004. Please contact me after you have reviewed this offer with your client.

(*Id.*)

Lopez met with Villasenor in person to review the government's June 18th offer. Lopez testified that he brought the proposed plea offer with him. (Tr. 220.) The parties agree that Lopez gave Villasenor a copy of the proposed formal plea offer and discussed it with him.

During the evidentiary hearing, Lopez could not recall if he brought the cover letter with him. (Tr. 242.) He testified that if he had done so, he would not have given it to Villasenor because he did not think it was appropriate for Villasenor to have it since it was addressed to Lopez. (Tr. 220.) But Lopez testified that he was familiar with the contents of the letter and

discussed them with Villasenor. Thus, Lopez's position is that he discussed the contents of the plea offer, as well as the contents of the cover letter, with Villasenor.

According to Lopez, he told Villasenor that the government might file one or two § 851 enhancements, that the government continued to be interested in Villasenor's cooperation, that proffering about his prior convictions might lead to a reduction in Villasenor's criminal history level and a resulting lower Guideline range, and that if he cooperated, his wife might get pretrial diversion. (Tr. 221-22.) Lopez denied that he told Villasenor that "the government had a weak case against him." (Tr. 223.) While Lopez agreed that the government had a strong case on certain counts, he denied telling Villasenor that he should proceed to trial because he had a good chance of winning. (Tr. 224.) Inconsistently, however, Lopez also testified that he advised Villasenor that he "had a very good chance of winning" the conspiracy count because Lopez was "doing research on multiple conspiracy and buyer seller arrangements" so "the whole trial would be focused upon trying to win the conspiracy count and the buyer seller to minimize the amount of drugs that [the government was] claiming [Villasenor] was involved in because [Villasenor] thought that the amounts were completely overstated." (*Id.*)

With respect to the substantive counts against Villasenor, "including possession with intent to distribute, the gun counts, et cetera," Lopez testified that he told Villasenor that he thought:

> [T]he gun count was weak because [Villasenor] wasn't home or at the location
> when they found the gun. So I didn't think it was a terribly strong charge against
> [Villasenor]. Some of the transactions were recorded. If I remember one, there
> was some kind of – I don't know – a breach in surveillance, I just don't
> remember. There was one count that I thought was fairly weak. I think that's the
> count that [Villasenor] was found not guilty of. And the drug offense level was
> [sic] he would never – he was not going to agree to that much. He said that was
> impossible, that it wasn't that much.

(Tr. 223-24.)

Following his conversation with Lopez, Villasenor rejected the proposed plea offer. As Lopez explained, Villasenor "[d]idn't agree with the guideline calculations, and neither did I. Neither one of us did." (*Id.*) Villasenor also told Lopez that he believed that the government "didn't have a case against his wife, that she didn't do anything." (Tr. 222-23.)

Consistently with Lopez's testimony that he would not have given the June 18th cover letter to Villasenor, Villasenor testified that he saw the cover letter for the first time when the government produced it in discovery for this § 2255 proceeding. (Tr. 66-67.) However, Villasenor asserts that Lopez did not discuss the contents of the cover letter with him. (Tr. 66-67.) According to Villasenor, because Lopez did not relay the substance of the cover letter, he did not know that the government was willing to consider a deal if he cooperated; he believed that the only potential deal on the table was outlined in the proposed formal plea offer. Villasenor contends that he would have "accepted the terms set forth in the June 18, 2004, letter had he known about them," and that the government and the court would have accepted a plea based on those terms. (Dkt. 57 at 12-20.)

### 6.    The Decision to Enter Into, and then Seek to Withdraw, a Blind Plea

Lopez and Villasenor discussed entering a blind plea. Lopez recommended a blind plea to challenge the Guideline calculations and the § 851 enhancement. (Tr. 225.) Lopez believed that Villasenor understood that this strategy required Villasenor to establish that he was responsible for less than five kilograms of cocaine. If he could do so, the statutory minimum would be five (not ten) years and a § 851 enhancement would make his sentence ten (not twenty)

years.  Lopez believed that Villasenor understood that he could be held responsible for more or less than five kilograms of cocaine.  (Tr. 225-26.)

On the morning of July 1, 2004, the day of Villasenor's scheduled plea, the government filed a notice of § 851 enhancement.  Villasenor learned that the government had filed this notice moments before entering his plea.  Lopez, however, testified that he discussed the possibility that the government would file a notice with Villasenor before the day of the plea.  (Tr. 265-66.)

On July 30, 2004, Villasenor, through Lopez, filed a motion to withdraw his guilty plea. (Gov. Ex. 8.)  In the motion, Villasenor relied on *Booker* and *Blakely*, and stated that he did not have adequate time to consider his decision to plead guilty in light of the changing law and the fact that the government filed the § 851 notice on the morning of the plea hearing.  The court allowed Villasenor to withdraw his guilty plea.

### 7.    The September 29, 2004 Letter

On September 29, 2004, Alesia wrote a letter to Lopez.  (Gov. Ex. 12.)  Alesia stated that until November 24, 2004, Villasenor could proffer truthfully and cooperate.  (*Id*.)  If he did, and the government could confirm that his prior drug convictions were part of the charged conspiracy, his criminal history category would be I and the government would consider withdrawing the notice of § 851 enhancement.  (*Id*.)  If he went to trial, however, the government would not offer Villasenor's wife the option of pretrial diversion.  (*Id*.)  Villasenor again told Lopez that he was not interested in cooperating. (Tr. 229-30.)

That same day, Lopez wrote to Villasenor, stating that the government would "under no circumstances" withdraw the § 851 notice.  (Def. Ex. 6.)  At the evidentiary hearing, he explained that he did so because he understood that the government would withdraw the § 851

notice only if Villasenor cooperated and that Villasenor had declined to do so. (Tr. 267-68.) According to Lopez, he used the phrase "under no circumstances" based on his assumption that Villasenor "didn't want to cooperate." (Tr. 268.) When asked to clarify, Lopez testified that this assumption was premised on "[Villasenor] telling me he didn't – he wasn't going to cooperate." (*Id.*)

### 8. Trial and Sentencing

A jury found Villasenor guilty of most of the counts against him, including the conspiracy counts. Specifically, the jury found Villasenor guilty of sixteen counts charged in the indictment and not guilty of two counts relating to the distribution of cocaine arising out of a transaction on January 24, 2003, and one count relating to the use of a telephone to facilitate a conspiracy arising out of a transaction on March 21, 2003. *Villasenor*, 664 F.3d at 678.

In Villasenor's sentencing memorandum, Lopez argued that "the witnesses that testified to the drug amounts were all liars and were impeached." (No. 03 CR 689-2, Dkt. 914 at 7.) Lopez also argued that Villasenor's prior convictions could not form the basis of a § 851 enhancement because one predated the charged conspiracy and the other two were part of the conspiracy charged in this case. At sentencing, the court declined to enhance Villasenor's sentence based on his possession of a gun, applied a leader or organizer enhancement, and rejected Villasenor's § 851 argument based on its finding that even if the two convictions were arguably part of the conspiracy, the enhancement was still appropriate. (No. 03 CR 689-2, Dkt. 1012 at 66-67.) Villasenor's Guideline range was 360 months to life with a mandatory minimum of twenty years. The court sentenced him to a term of imprisonment of 300 months.

The government's formal plea proposal had specified a range of 292-365 months, which could have led to a sentence that was more favorable to Villasenor. All four of the alleged deals that are the subject of Villasenor's § 2255 motion would have been more favorable. Working backwards chronologically, these are: (1) the June 18, 2004 cover letter accompanying the formal plea proposal, which referenced a sentencing range of 210-262 months if Villasenor cooperated, plus an unspecified "small percentage off for cooperation"; (2) the alleged April and March 2004 offers of thirteen and eighteen years (156 and 216 months, respectively), also based on Villasenor's cooperation; and (3) the alleged February 2004 offer for Villasenor to plead guilty to two to four kilograms of cocaine with a sentencing range of 78 to 97 months.

## II. LEGAL STANDARD

A person convicted of a federal crime may move to vacate, set aside, or correct his sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a). "The Sixth Amendment right to effective assistance of counsel extends to the plea bargaining process." *Martin v. United States*, 789 F.3d 703, 706 (7th Cir. 2015) (citing *Lafler v. Cooper*, — U.S. —, 132 S.Ct. 1376, 1384 (2012)). To establish ineffective assistance of counsel, Villasenor must show that: (1) his trial attorney's performance "fell below an objective standard of reasonableness" and (2) "but for counsel's unprofessional errors the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 688 (1984). If Villasenor cannot establish one of the *Strickland* prongs, the court need not consider the other prong. *See Strickland*, 466 U.S. at 697.

In the context of plea negotiations, defense counsel has a duty to convey formal offers from the government "to accept a plea on terms and conditions that may be favorable to the

[defendant]." *Missouri v. Frye*, — U.S. —, 132 S. Ct. 1399, 1408 (2013). When ineffective assistance results in the rejection of a plea offer (or as in *Frye,* the offer expires due to ineffective assistance), prejudice under *Strickland* exists even when the defendant ultimately is convicted at trial. *Lafler*, 132 S.Ct. at 1386. Thus, "to succeed on a claim that counsel's ineffective assistance led him to reject the Government's plea offers," a habeas movant "must show not only that [his attorney] acted in error, but also that – had [his attorney] provided competent advice – there is a reasonable probability that the plea offer would have been presented to the court, that the court would have accepted it, and that the conviction or sentence or both would have been less severe than the judgment imposed." *Foster v. United States*, 735 F.3d 561, 566 (7th Cir. 2013) (citing *Lafler*, 132 S.Ct. at 1384-85); *see also Julian v. Bartley*, 495 F.3d 487, 498 (7th Cir. 2007) (prejudice exists if counsel's advice fails to meet the performance prong of *Strickland* and is "the decisive factor in [the] decision to plead guilty or to proceed to trial").

### III. ANALYSIS

Proceeding in chronological order, Villasenor's request for § 2255 relief raises three groups of questions:

1. Did the government made a plea offer that would have required Villasenor to plead guilty to two to four kilograms of cocaine, which would have resulted in a sentencing range of 78 to 97 months? If so, did counsel properly convey that offer to Villasenor?

2. Did the government make plea offers that would have resulted in sentences of thirteen and eighteen years? If so, did counsel properly inform Villasenor of these offers and provide constitutionally effective advice?

3. Was the government's June 18, 2004 letter a formal plea offer? If so, did Villasenor's counsel fail to communicate that offer or fail to advise Villasenor

properly regarding the letter?  If not, did counsel provide constitutionally effective advice regarding the letter?

For the following reasons, the court finds that the government did not offer Villasenor deals that would have allowed him to plead guilty to two to four kilograms of cocaine or receive sentences of either thirteen or eighteen years.  In addition, the court rejects Villasenor's contention that the government's June 18, 2004 cover letter contained a formal plea offer.  It further finds that, in any event, Lopez told Villasenor about the contents of the letter and provided constitutionally effective advice about the letter.

**A.      The Alleged Offer for Villasenor to Plead Guilty to Two to Four Kilograms of Cocaine**

Villasenor contends that in February 2004, the government made a plea offer under which he could have pled guilty to a drug quantity of two to four kilograms of cocaine with a sentencing range of 78 to 97 months.  He asserts that Lopez failed to advise him of this purported offer in a timely fashion so it expired before he could accept it.  In support, Villasenor points to telephone records from the MCC that show that he frequently spoke with his wife and occasionally spoke to Lopez.  Villasenor argues that some of these calls correspond to the dates when Lopez purportedly told Nicol Villasenor about the alleged two to four year offer, Villasenor called Lopez to follow up, and Lopez belatedly presented the offer to Villasenor.  Villasenor also contends that it was reasonable to attribute two to four kilograms of cocaine to him because Lopez advocated for less than five kilograms of cocaine at the July 1, 2004 change of plea hearing.  Finally, Villasenor asserts that the alleged two to four kilogram offer is credible because it predates the March 18, 2004 meeting when the prosecutors calculated a much higher quantity attributable to Villasenor.

"A claim of ineffective assistance of counsel with respect to the plea negotiation process presupposes the existence of a plea agreement." *Martin*, 789 F.3d at 707. Villasenor and his wife may hold a sincere belief, perhaps based on a misunderstanding, that the purported two to four kilograms of cocaine offer plea agreement existed. The existence of this offer turns on credibility and an assessment of the record. Setting aside concerns about the plausibility of an oral formal plea offer, there is no discernible reason for the government to have offered Villasenor such a low drug quantity.

Alesia testified – very credibly – that the government believed that about 600 kilograms of cocaine could be attributed to Villasenor and that sentencing enhancements and a criminal history category of IV would result in a Guideline range of 292-365 months. (Gov. Ex. 10.) In a best case scenario for Villasenor given the government's position, if he cooperated and established that his prior drug convictions were part of the charged conspiracy, he would be in criminal history category I with a Guideline range of 210-262 months. (Tr. 145-146.) Even assuming some sort of modest discount off of the low end of this range up to 25% (Tr. 146-147), given these figures, a drug quantity of two to four kilograms of cocaine and a sentencing range of 78 to 97 months makes no sense. It is also inconsistent with the evidence that was discussed during the prosecution's internal meeting regarding Villasenor, as well as the government's position in the June 2004 draft proposed plea agreement and formal proposed plea agreement (Gov. Ex. 1 and 3, respectively) that at least 150 kilograms of cocaine was attributable to Villasenor.

The court understands that Villasenor disagreed with the government's view of the evidence. But the government was not required to accept Villasenor's interpretation of that

evidence, and there is no persuasive evidence that it did. The court finds that Alesia's testimony about the government's position is credible and reflects the government's view regarding drug quantity. This is fatal to Villasenor's contention that the government offered him a plea that would have allowed him to plead guilty to a drug quantity of two to four kilograms of cocaine.

The phone records do not alter this conclusion. They show that calls were made, not what transpired during those calls. It is true that Lopez advocated generally for four kilograms of cocaine at the July 1, 2004 change of plea hearing. (Change of Plea Tr. 16, 20.) But the government advocated for a higher quantity. (Change of Plea Tr. 18-24.) The arguments of defense counsel and the government are not evidence and do not establish that Villasenor's quantity was right and the government's quantity was wrong. Moreover, the fact that the alleged two to four kilogram offer in February 2004 modestly predates the March 18, 2004 meeting where the prosecutors calculated a much higher drug quantity throws additional doubt on the existence of the alleged February 2004 offer of two to four kilograms.

In sum, the court accepts Alesia's testimony that he never would have made such an offer because it would have been "so far out of the realm of possibility based on the evidence we had" (Tr. 171) and finds that the testimony supporting the alleged offer is not credible. Lopez cannot have rendered constitutionally ineffective assistance by failing to convey a non-existent offer. The request for § 2255 relief based on the purported two to four kilogram plea offer is denied.

**B.  The Alleged Plea Offers That Would Have Resulted in Sentences of Thirteen and Eighteen Years**

Next, Villasenor argues that the government made oral plea offers premised on his cooperation that would have allowed him to receive sentences of thirteen and eighteen

years.[2]  He asserts that Lopez's assessment of the strength of the government's case was unrealistic and caused Lopez to violate the Sixth Amendment by advising him to reject these offers.  Relatedly, Villasenor contends that the notes from the government's internal meeting show that sentences of approximately thirteen and eighteen years were on the table and that Lopez "failed to adequately advise [him] about whether to pursue disposition along those terms" because "Lopez completely underestimated the strength of the government's case."  (Dkt. 57 at 24-25.)

As with the alleged two to four kilograms of cocaine offer, Villasenor and his wife testified that the alleged thirteen and eighteen year offers existed while Lopez and Alesia testified that they did not.  The court does not believe that there were any such offers for Lopez to present.  At best, Villasenor's belief that the government was willing to offer him a cooperation deal for thirteen or eighteen years is based on informal discussions between Lopez and Alesia about possible resolutions of Villasenor's case.

Villasenor's position about the purported thirteen and eighteen year offers suffers from multiple flaws.  First, Lopez and Alesia deny that the government offered Villasenor a deal with a thirteen or eighteen year sentence.  During the evidentiary hearing, the court observed the witnesses as they testified.  It does not believe that Alesia ever made the alleged plea offers.

Second, it is undisputed that the alleged offers were premised on Villasenor's cooperation.  Even if Villasenor had been willing to cooperate (which does not appear to be the case) it is difficult to see how Alesia could have made definitive offers without a proffer that

---

[2]  In his pro se § 2255 motion, Villasenor indicated that the offers were for thirteen and fifteen years.  During the evidentiary hearing, Villasenor clarified that these offers were for thirteen and eighteen years.  (Tr. 59.)

would have allowed the government to assess the value of Villasenor's cooperation.   The court does not believe that Alesia would have selected numbers without this information or that his supervisors would have approved any such numbers.  This is consistent with the government's internal March 18, 2004 meeting, when the government attorneys did not reach agreement on what, if any, credit Villasenor would get if he decided to cooperate because they did not know what he would say.

Third, Villasenor asserts that Lopez presented the alleged offers to him and that he would have accepted either offer but for Lopez's poor advice that "the government's case was weak and he could get less time at sentencing without a plea agreement."  (Dkt. 57 at 24.)  Even assuming that Villsenor would have cooperated but for Lopez's advice, Villasenor is entitled to habeas relief only if he establishes that if Lopez had counseled him to accept the alleged offers, "there is a reasonable probability that the plea offer would have been presented to the court" and accepted.  *Foster*, 735 F.3d at 566.  Non-existent offers, by definition, could never be in a procedural posture to be presented to the court.

Fourth, based on Villasenor's contention that Lopez "failed to adequately advise [him] about whether to pursue disposition along those terms" (*i.e.*, cooperation deals with sentences of thirteen or eighteen years), Villasenor may be contending that Lopez, when faced with alleged informal discussions about a possible deal including those sentences, failed to pursue plea negotiations sufficiently and thus prevented Villasenor from receiving a formal plea agreement that was better than the one the government eventually offered.  This incorrectly assumes that the record supports the conclusion that the government would have offered Villasenor a better deal than it eventually did.  Lopez cannot be ineffective for failing to pursue the unattainable.  *See*

*Cooper v. United States*, No. 08 C 5792, 2010 WL 4670825, at *6 (N.D. Ill. Nov. 8, 2010)

("There is simply no evidence from which the court could find a reasonable probability that the

government would have offered [the defendant] a plea agreement if [his counsel] had pursued

[plea negotiations]."). Thus, the request for § 2255 relief based on the alleged thirteen and

eighteen year plea offers is denied.

**C.     The June 18, 2004 Letter**

Villasenor's final group of arguments centers on the last paragraph of the June 18, 2004

cover letter to Lopez that accompanied the approved formal plea proposal. As noted above, the

formal plea proposal specified a Guideline range of 292-365 months. The last paragraph of the

government's cover letter advised Villasenor that he had until the close of business on Friday,

July 2, 2004, to proffer truthfully and agree to cooperate against his remaining co-defendants. If

he did so and the government was able to confirm that his prior drug convictions were part of the

charged conspiracy, (1) he would be in criminal history category I with a sentencing range of

210-262 months (as opposed to 292-365 months), (2) the government "would consider a small

percentage off the low end of the applicable Guideline range" (which the prosecutors had agreed

would be an as-yet-undetermined percentage not to exceed 25% depending on their valuation of

Villasenor's cooperation) and (3) the government would recommend that Nicol Villasenor

receive pretrial diversion. (Gov. Ex. 4.) The letter closed with, "Again, this offer will be valid

through close of business on July 2, 2004, at which time the government will begin preparations

for trial to begin on July 26, 2004. Please contact me after you have reviewed this offer with

your client." (*Id.*)

Villasenor argues that the letter is a formal offer, that Lopez failed to convey the offer to

him, and that this failure was prejudicial because he has shown a reasonable probability that he would have accepted the offer and that the government and the court would have accepted a guilty plea. Alternatively, Villasenor contends that even if the letter is not a formal offer, Lopez's advice violated Villasenor's right to effective counsel because Lopez "led [Villasenor] down a path that doubled his mandatory minimum sentence." (Dkt. 57 at 7.)

### 1. Was the June 18, 2004 Letter a Formal Plea Offer and Did Lopez Convey the Contents of the Letter to Villasenor?

The parties disagree as to whether Lopez was required to convey the June 18, 2004 letter to Villasenor if it was not a formal plea offer. Several courts in this district have held that a habeas movant need not establish that a formal plea agreement existed in order to establish ineffective assistance during plea negotiations. *See Penaloza v. United States*, No. 12 C 8728, 2015 WL 230402, at *4 (N.D. Ill. Jan. 16, 2015) ("The fact that the cover letter was not a 'formal offer' is irrelevant" because a defendant is entitled to effective assistance of counsel during all stages of the plea negotiation process); *Lechuga v. United States*, 15 F. Supp. 2d 788, 793 (N.D. Ill. 2014) (ordering an evidentiary hearing based on the movant's allegations about advice provided during plea negotiations, even in the absence of a formal plea offer).

The court need not tarry on whether the cover letter's final paragraph is a formal plea offer because the answer to the question does not affect the outcome. Whatever type of offer it was—formal, informal, or an offer to consider a potential resolution short of trial if Villasenor agreed to cooperate and other events occurred—Lopez communicated it to Villasenor. Villasenor stresses that Lopez did not show him the actual letter. The court, however, accepts Lopez's testimony that he met with Villasenor in person to review the proposed formal plea

agreement and discussed the contents of the cover letter with Villasenor, including the section about Villasenor's potential cooperation.

Specifically, Lopez advised Villasenor that the government might file one or two § 851 enhancements, that the government continued to be interested in Villasenor's cooperation, that a proffer might lead to a reduction in Villasenor's criminal history level and lower his Guideline range, and that cooperation could help his wife get pretrial diversion. (Tr. 221-22.) Villasenor testified that Lopez did not disclose any of this information to him. But based on its observations during the evidentiary hearing and considering all of the evidence, the court cannot credit Villasenor's testimony on this subject. Lopez testified that he discussed the substance of the cover letter with Villasenor, and the court believes his testimony. Lopez's disclosure of the substance of the cover letter satisfies *Strickland*'s performance prong. Moreover, Villasenor cannot satisfy *Strickland*'s prejudice prong based on Lopez's failure to convey information that Lopez, in fact, conveyed.

### 2. Lopez's Advice About the June 18, 2004 Letter

Alternatively, Villasenor contends that even if Lopez told him about the contents of the letter, Lopez gave him substandard advice about that letter. According to Villasenor, this advice left him with no option other than proceeding to trial and being subjected to a § 851 enhancement that doubled his mandatory minimum sentence.

It is "difficult for any court to determine in hindsight whether a criminal defendant would have pled guilty had he received competent advice from counsel." *Meyers v. Gillis*, 142 F.3d 664, 668 (3d. Cir. 1998). Whether a defendant would have accepted a plea deal in light of different advice "is not a historical fact question in the usual sense (it is indeed a hypothetical

question), and so traditional measures of credibility might not fully apply to the question." *Quintana v. Chandler*, No. 08 C 05629, 2012 WL 3151260, at *10 (N.D. Ill. Aug. 2, 2012), *aff'd by* 723 F.3d 849 (7th Cir. 2013). Nevertheless, the difficulty of the question "cannot restrict our analysis nor cause us to deny relief that is otherwise appropriate and required under law." *Meyers*, 142 F.3d at 668. "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged" and whether "the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Strickland*, 466 U.S. at 696. With this perspective in mind, the court turns to whether Lopez's advice fails to satisfy *Strickland*'s performance and prejudice prongs.

The following findings of fact are relevant to these inquiries. Stepping back to April 2004, Lopez discussed cooperation with Villasenor. (Tr. 206-07.) He also discussed the Guidelines and the possibility of a § 851 enhancement, which was an "important issue" for Villasenor. (*Id.*) Lopez told Villasenor that cooperation might enable Villasenor to receive a lower sentence, but Villasenor still did not want to cooperate. Based on his interactions with Villasenor in this case, as well as prior cases, Lopez did not think that Villasenor was the kind of person who would ever cooperate. (Tr. 207-11.)

Subsequently, when Lopez visited Villasenor to discuss the formal plea agreement in June 2004, Lopez discussed the contents of the accompanying cover letter, including the possibility that the government would file one or two § 851 enhancements and the government's continued interest in Villasenor's truthful cooperation. (Tr. 221-22.) Lopez explained that

cooperation could lead to a lower Guideline range and pretrial diversion for Villasenor's wife.

(Tr. 222.)

Lopez's testimony about his advice to Villasenor and his view of the case was

inconsistent and contradictory in places:

- Lopez testified that he believed that the gun count against Villasenor was "weak" because Villasenor was not at the location where the gun was found. (Tr. 223-24.)

- Lopez testified that he believed that the evidence supporting one of the drug transactions was "fairly weak" because of "a breach in surveillance." (Tr. 224.)

- Lopez testified that he thought that Villasenor could "beat the conspiracy and fight the drug quantity" (Tr. 255) and that the government would not be able to prove that Villasenor was responsible for 150 kilograms of cocaine (Tr. 236). This is consistent with Lopez's position at the earlier change of plea hearing when Lopez argued that Villasenor's Guideline range was 121-151 months or, if the drug quantity was less than five kilograms, even lower. (Tr. 256-57, Gov. Ex. 13 at 1-16.)

- Lopez testified that he advised Villasenor that he "had a very good chance of winning" the conspiracy count because Lopez was "doing research on multiple conspiracy and buyer seller arrangements" so "the whole trial would be focused upon trying to win the conspiracy count and the buyer seller to minimize the amount of drugs that [the government was] claiming [Villasenor] was involved in because [Villasenor] thought that the amounts were completely overstated." (Tr. 223.)

- Lopez testified that neither he nor Villasenor agreed with the government's Guideline calculations. (Tr. 224.)

- Lopez denied that he ever told Villasenor that the government's case was "weak." (Tr. 223.)

- Lopez denied that he ever told Villasenor that he should proceed to trial because he had "a good chance of winning" or that he ever advised Villasenor against cooperation. (Tr. 224.)

- Lopez testified that he advised Villasenor that the government was still interested in Villasenor's cooperation, which might lead a lower sentence. (Tr. 221-22.)

- With respect to Lopez's belief about drug quantity, Lopez denied that he told Villasenor that Villasenor would be held responsible for less than five kilograms. (Tr. 265.) Instead, Lopez asserts that he told Villasenor that there was a possibility that the government could prove that Villasenor was responsible for more than five kilograms of cocaine. (Tr. 264.)

- Lopez agreed that "there were certain counts against [Villasenor] that were strong for the government." (Tr. 224.)

- Lopez testified that he thought the government could prove that Villasenor was responsible for more than five kilograms of cocaine *and* that he did not believe that the government could prove this, even though he agreed that he was aware of cocaine seizures from co-defendants Stevie Jones (four kilograms), Robert Rider (two kilograms, with Villasenor's fingerprints on the pack), and Gabriel Maldanado (seven or ten kilograms). (Tr. 263-64.).

With this background in mind, the court turns to Lopez's advice about the June 18, 2004 cover letter. As noted above, although Lopez's advice about the letter during the evidentiary hearing was mixed, the court will give Villasenor the benefit of the doubt and accept all of Lopez's testimony at face value. The court's task is to determine whether, absent the positive portions of Lopez's advice about the cover letter and Villasenor's prospects at trial, Villasenor would have cooperated and received a lower sentence.

Lopez's admission that he thought Villasenor would beat the conspiracy charge on a hub-and-spoke theory is the most troubling part of his testimony since this court has seen this theory defeated so many times that it views it with skepticism, as indeed Lopez should have. Indeed, twenty-five years ago, the Seventh Circuit noted that "[t]he fact that we can squeeze a group into a hypothetical organizational chart says little about whether a single agreement exists between the members of the group" as "organizational construct[s] . . . don't eliminate the need to inquire directly into whether the defendants had a mutual interest in achieving the goal of the

conspiracy." *United States v. Cruse*, 805 F.3d 795, 813 (7th Cir. 2015) (quoting *United States v. Townsend*, 924 F.2d 1385, 1392 (7th Cir. 1991)).

Nevertheless, Lopez is not the only attorney who has raised a hub-and-spoke defense. *See United States v. Long*, 748 F.3d 322, 331 (7th Cir. 2014) (noting the defendants' unsuccessful argument that "he was merely a distributor . . . with no part in the broader organization" so "should not be held responsible for the activities of the entire organization"); *see also United States v. Toader*, 409 F. App'x 9, 12-13 (7th Cir. 2010) (rejecting the district court's finding that the defendants' connection was "a non-perfect hub and spokes situation" where "each was responsible for his own line of authority or chain of command" but "there was a lot of interaction along the spokes" because "[e]ven if a defendant was aware that another person was involved in one part of a broad scheme, if the defendant did not join that part, his sentence cannot be based on it"). This is consistent with the Seventh Circuit's opinion in Villasenor's direct appeal, which discussed Villasenor's claim that he merely was part of a buyer-seller arrangement, not a conspiracy, at length. *Villasenor*, 664 F.3d at 679-80.

A mistaken prediction about the outcome of a trial can form the basis for § 2255 relief if it is a "gross mischaracterization." *Anderson v. United States*, 334 F. App'x 8, 10-11 (7th Cir. 2009); *see also Lafler*, 132 S.Ct. at 1391 ("an erroneous strategic prediction about the outcome of a trial is not necessarily deficient performance"). In the context of plea negotiations, a defendant can meet this standard if he establishes that counsel advised him "to reject a plea bargain in the face of overwhelming evidence of guilt and an absence of viable defenses." *Gallo-Vasquez v. United States*, 402 F.3d 793, 798 (7th Cir. 2005). While this court believes

that a hub-and-spoke defense is less than compelling, it does not amount to a gross mischaracterization of the strength of the government's case.

Moreover, as summarized above, Lopez was not uniformly positive about Villasenor's chances at trial. While Villasenor focuses today on the optimistic portions of Lopez's advice, that advice must be viewed alongside his other advice, including his negative advice and his contradictory views about the government's evidence supporting the drug quantity it sought to attribute to Villasenor. *See Anderson*, 334 F. App'x at 10-11 (affirming denial of § 2255 relief when defense counsel told the defendant he had a fifty percent chance of winning at trial because that advice "was not so 'overly sanguine or recklessly optimistic' as to likely convince an otherwise cautious defendant to go to trial").

"Because reasonable attorneys may have a great deal of disagreement about appropriate strategy or tactics, a defendant challenging the effectiveness of counsel must show more than that counsel made poor choices." *Julian*, 495 F.3d at 495; *United States v. Torres-Chavez*, No. 14 C 9405, 2015 WL 508184, at *3 (N.D. Ill. Feb. 5, 2015). Here, there is no evidence that Lopez told Villasenor he would beat the conspiracy charge; rather Lopez told Villasenor that he had a "very good chance" of doing so and gave Villasenor a mix of positive and negative advice. Lopez was advising a client who had been adamant in his refusal to cooperate and had expressed anger at those who had cooperated. In the circumstances presented here, the court cannot find that an experienced attorney's perhaps excessive optimism (tempered with some negativity) amounts to incompetent advice. In light of this conclusion, the court need not address prejudice, *Strickland*, 466 U.S. at 697, and Villasenor's request for § 2255 relief based on the June 18, 2004 cover letter is denied.

## IV. Certificate of Appealability

Because the court has found that Villasenor is not entitled to relief, it considers whether to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(2); *Gonzalez v. Thaler*, — U.S. —, 132 S.Ct. 641, 649 n.5 (2012). Villasenor is entitled to a certificate of appealability if he can make a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). To satisfy this standard, he must demonstrate that reasonable jurists could find the court's assessment of his § 2255 claims debatable or wrong, or would believe that the issues presented deserved encouragement to proceed further. *See id.* It is possible for reasonable jurists to reach a different conclusion with regard to Lopez's advice about the government's June 18, 2004 letter. The court will grant Villasenor a certificate of appealability as to this issue.

## V. Conclusion

For the above reasons, the court denies Magin Villasenor's motion for relief pursuant to 28 U.S.C. § 2255 [1] but grants a certificate of appealability as detailed above. The clerk is directed to enter judgment accordingly. The court also directs the clerk to correct the misspelling of Villasenor's first name on the docket in the underlying criminal case (03 CR 689-2).

Date:  March 2, 2016                                    _____/s/_____
                                                        Joan B. Gottschall
/cc                                                     United States District Judge

-28-